## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

JAMES R. ZAZZALI, as Trustee for the
DBSI Estate Litigation Trust and as Trustee
for the DBSI Private Actions Trust,

                Plaintiff,

v.

MARK ELLISON,
                Defendant.

Case No. 1:12-CV-284-EJL-MHW

**REPORT AND
RECOMMENDATION ON MOTION
TO DISMISS**

Pending before the Court is a motion to dismiss filed on behalf of Defendant Mark Ellison. (Dkt. 13).  This case was referred to the undersigned United States Magistrate Judge for all dispositive and non-dispositive matters on October 16, 2012. (Dkt.10, p. 2).  Having reviewed the pleadings and affidavits pertinent to the motion (Dkts. 13, 13-1, 13-2, 19, & 23), and having entertained oral argument on February 5, 2013, the Court hereby enters the following Report and Recommendation.

## BACKGROUND

This is another case arising from the collapse of DBSI, Inc, for many years a large and

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  1**

successful real estate company located in Boise Idaho.[1]   The Plaintiff is James T. Zazzali, the court-approved Trustee of two trusts created by the DBSI Plan of Liquidation and confirmed by Order of the United States Bankruptcy Court for the District of Delaware on October 26, 2010.  (Complaint, p. 4, Dkt. 1).  The first of these trusts, the Estate Litigation Trust ("ELT") was created to hold all causes of action belonging to DBSI Debtor Entities, whereas the Private Action Trust ("PLT") consists of claims by creditors and equity holders of DBSI which have been assigned to the Trust. (*Id.* ¶ 1).  The Defendant is Mark Ellison, a co-founder of DBSI who, from 2004 onwards, was also the head of its in-house legal department.   The Trustee alleges that Ellison, along with several other individuals who are defendants in a companion case,[2] was responsible for perpetrating a Ponzi scheme that led to the eventual collapse of DBSI after the downturn in the real estate market in 2008.  The Trustee has brought claims under federal and Idaho anti-racketeering statutes, as well as claims for securities fraud, common law fraud, negligence, and breach of fiduciary duty.

The events giving rise to this lawsuit are complex and are set forth in more than five hundred paragraphs of factual allegations.  With some emendations, these allegations largely tell the same story as does the complaint in the *Zazzali v. Swenson* matter.  Rather than entering into a detailed factual discussion here, the Court will incorporate by reference the background discussion in its January 25, 2013 Report and Recommendation in that case.

---

[1]DBSI was not one entity, but rather, vast agglomeration of entities related in ways that are sometimes quite complex.  For simplicity's sake, Court will simply refer to the various entities as "DBSI" or "the DBSI entities," unless the context calls for greater specificity.

[2]See, *Zazzali v. Swenson, et. al.,* Case No. 1:12-cv-00224-EJL-MHW.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  2**

(*See* Case No.12-00224, Dkt. 256, at 3-8).  As in  *Zazzali v. Swenson*, the overarching

questions are not so much whether the Complaint describes the overall fraud in sufficient

detail, but whether Ellison's role in it has been pled with sufficient particularity to satisfy the

standards of Rule 8(a), Rule 9(b), and the Private Securities Litigation Reform Act

("PSLRA").  Therefore, the Court will focus its factual discussion on those allegations that

address Ellison's individual actions, rather than those allegations that simply lump him

together with the rest of the defendants alleged to have played a role in the fraud.

Ellison was one of DBSI's original principals who set up the company along with his

colleague, Douglas Swenson, in the late 1970s.  He left DBSI in 1992 to work in a private

law firm but maintained his relationship with DBSI as its outside counsel. Twelve years later,

he returned as inside counsel in October of 2004, which is when the Trustee alleges that

DBSI had begun to take on characteristics of a Ponzi scheme.  (Complaint, ¶¶ 4 & 15-18,

Dkt. 1).

The Complaint does not contain a lot of detail regarding Ellison's overall role at DBSI

from 2004 onward, other than to state generally that he was tasked with "respond[ing] to any

legal questions or issues presented to him by Douglas Swenson or other members of the

management team."  (*Id.,* 18). However, the Complaint does discuss in some detail his

alleged role in drafting and/or signing off on various Private Placement Memoranda

("PPMs").  The PPMs were a series of offering documents distributed to potential investors

in connection with various DBSI real estate and securities offerings.  The PPMs are central

to the Trustee's claims and are alleged to have been the primary means by which the fraud

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  3**

was perpetrated.  (*Id.,* ¶¶ 19, 49-51, 186, 302, & 303).   The Complaint alleges that Ellison was "familiar with the substance and content of the PPMs and played an integral role in the drafting and reviewing of fraudulent and misleading language found in the PPMs and other offering materials since DBSI's inception, including the time he represented DBSI as outside counsel."  (*Id.* ¶ 49).  More specifically, it alleges that from about 2006 onwards, the vast majority of all PPM drafting was done in house at DBSI, and that legal work concerning PPMs therefore would have been under Ellison's supervision as general counsel.  (*Id.*).  The Complaint further alleges that even during the time when PPM drafting was handled by outside counsel, Ellison remained involved, as evidenced by references to his name on bills for legal work submitted by outside counsel.  (*Id.,* ¶¶ 49 & 186).  The Trustee  also alleges that the DBSI legal department was required to "sign off" on every PPM, as evidenced by PPM signoff sheets and securities offering checklists prepared in connection with each offering.  (*Id.,* ¶¶ 50, 302). Finally and most specifically, it alleges that emails reveal that Ellison and other DBSI attorneys received drafts of the PPMs and had to sign off on them prior to their finalization. (*Id.,* ¶¶ 50-51, 302-303).

The Complaint also contains a number of allegations which attempt to show that Ellison was aware of the DBSI's dire financial picture in the years leading up to its bankruptcy.  For example, it alleges that Ellison attended accounting and finance presentations where he was informed of the company's financial problems and short-term cash needs.  It also alleges these issues were also raised at board meetings, which Ellison attended and for which he prepared minutes. (*Id.* at ¶¶ 19, 20, 112, 175, & 497).  The

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  4**

Complaint also points to the fact that Ellison prepared term sheets for note offerings as evidence that he was aware of DBSI's ever-growing debt. (*Id.* ¶ 114, 177).  It also asserts that Ellison was responsible for instituting the "Loan Committee" which oversaw the disbursement of loans by various Internal Funding Programs as a cover for the Insiders' fraudulent scheme. (¶¶ 113, 176, 424 - 426).   It asserts that Ellison was responsible for supervising in-house attorneys who worked on the financial statements, and that in June of 2008, he himself prepared certain "footnotes" to financial statements, though the nature of these footnotes is not explained.  (¶ 498).   Finally, the Trustee asserts that two DBSI accounting employees, Paris Cole and Matt Duckett, informed Ellison that DBSI's financial statements did not conform to Generally Accepted Accounting Principles ("GAAP"). (¶ 502). The Complaint also alleges that Ellison admitted in his interview with the Bankruptcy Examiner that he was aware that the Accountable Reserve funds--which were supposed to have been used only for certain limited purposes, such as capital improvements, leasing commissions, taxes and insurance--were not segregated. (*Id,* ¶ 378).   The Trustee also asserts, on information and belief, that Ellison would have been responsible for drafting or reviewing the "Accountable Reserve" language contained in all or most of the PPMs. (*Id.* ¶ 307).

## LEGAL STANDARDS

The present motions are governed by the standards of Rule 8(a) and Rule 9(b) of the Federal Rules of Civil Procedure.   Federal Rule of Civil Procedure 9(b) requires that, when fraud is alleged, "a party must state with particularity the circumstances constituting fraud."

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  5**

*Gibson v. Credit Suisse AG,* 2012 WL 1253007 * 1 (D. Idaho 2012) (quoting *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir.2009). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong. Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged. A party alleging fraud must 'set forth more than the neutral facts necessary to identify the transaction.'" *Kearns,* 567 F.3d at 1124-25. Fraud can be averred either directly, by specifically averring fraud, or indirectly, by alleging facts that, if true, would necessarily constitute fraud even if the word 'fraud' is not used. *Id.,* 567 F.3d 1124. Rule 9(b) serves three purposes: "(1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.,* 567 F.3d at 1124–25.

Beyond that, Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id.* at 570. *See also, Ashcroft v. Iqbal,* 556 U.S.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  6**

662, 129 S.Ct. 1937 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly,* 550 U.S. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief. " *Id.* at 557.[3]

Thus, in considering the present motions, the Court will apply the standards of both Rule 8(a) and 9(b) apply to all fraud-based causes of action, and the standards of Rule 8(a) to everything else.

## DISCUSSION

### A.  Whether the Complaint Violates Rule 8(a)(2).

The Court will first address Ellison's argument that the Complaint violates Rule 8(a)(2). That rule, of  course, provides that "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a)(2). Ellison argues that the Trustee's Complaint violates this rule because it is anything but short and plain.

---

[3] Consistent with its decision in *Zazzali v. Swenson, et. al.,* the Court will not apply a "relaxed" pleading standard to the Trustee's claims.  As explained in that decision, it is questionable whether any kind of "relaxed" standard would apply after *Iqbal* and *Twombly. See, Case No. 1:12-cv-00224-EJL-MHW, Report and Recommendation on Motions to Dismiss,* p. 10, n. 6 (Dkt. 256). *See, also, In re Crescent Resources, LLC,* 2012 WL 195528 (Bankruptcy. W. D. Tex. 2012); *In re Walter,* 462 B.R. 698 (Bankruptcy N. D. Iowa 2011); *In re NE 40 Partners, Ltd. Partnership,* 440 B.R. 124, 127, n. 3 (S.D. Texas 2010).

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  7**

This argument has considerable merit.  At least as to its length, the Trustee's Complaint approaches Tolstoyan proportions.  It also, indisputably, engages in "group pleading" in that many, if not most, of the factual allegations do not address Ellison's conduct individually, but lump him together with the rest of the parties alleged to be "Insiders."  A number of allegations are also made upon "information and belief," with no supporting facts–a practice that is not permissible under either the heightened pleading standards of Rule 9(b) or the PSLRA.  *See,* 15 U.S.C. § 78u-4(b)(1); *Neubronner v. Milken,* 6 F.3d 666, 672 (9th Cir. 1993).  Compared to a number of the defendants in the companion case, Ellison's role in the overall structure of DBSI seems somewhat more limited.  The Complaint also contains a number of allegations that are of so unspecific a nature that the Court is left wondering if the Trustee simply crammed the Complaint with every known fact about Ellison, whether significant or not, in order to bolster its credibility.  To name just a couple of examples, the Trustee emphasizes that Ellison was involved with DBSI from 1979 onwards, but this is of little relevance to determining whether he played a role in a fraudulent scheme that is not alleged to have gotten underway until twenty-five years later. The Trustee also makes much of the fact that Ellison instituted the Loan Committee and selected its members, and that he prepared term sheets for note offerings.  Allegations like this do nothing more than point out types of tasks that it would be common for an in-house attorney to perform, and do nothing to explain how Ellison knowingly furthered the alleged fraud.

All of these factors have led the Court to seriously consider ordering the Trustee to submit a much shorter complaint focusing specifically on Ellison's individual actions and his

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  8**

individual role in the overall scheme.   It is not the job of district courts to stitch together

cognizable claims from a wholly deficient pleading.  *See, Mann v. Boatwright,* 477 F.3d 1140,

1148 (10th Cir. 2007). Dismissal under Rule 8(a) may be warranted where it is impossible to

"separate the wheat from the chaff."  *Id.*  As one district court within the Ninth Circuit has

observed:

> Although courts will extensively search complaints inartfully drawn by non-
> lawyers to find essential allegations, [w]hen attorneys admitted to practice in
> federal courts prepare complaints, neither the Court nor opposing counsel
> should be required to expend time and effort searching through large masses of
> conclusory, argumentative, evidentiary and other extraneous allegations in
> order to discover whether the essentials of claims asserted can be found in such
> a melange. It is the duty and responsibility, especially of experienced counsel,
> to state those essentials in short, plain and non-redundant allegations.

*Levine v. McDonald's Corp,* 1979 WL 1648 (D. Ariz. 1979).

What the Trustee appears to have done, in this case as well as in several others the

Court has now had an opportunity to review, is to take the same basic complaint and adjust

it slightly to address the individual defendant or defendants being sued.  This was, to put the

matter bluntly, a risky approach.   A two hundred-page complaint might have been justifiable

in *Zazzali v. Swenson,* considering that the Trustee had to 1) delineate a highly complex

scheme of alleged fraud, 2) explain the role of at least eight different defendants, and 3) meet

the heightened pleading standards applicable to various fraud claims.   Taking the same

approach in a case against a single defendant seems to contain some rather cavalier

assumptions about the ability–and willingness–of courts to sort through hundreds of

allegations to find those that are pertinent.  Thus, had this been the first DBSI case the Court

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  9**

had seen, it probably would have required the Trustee to submit a more streamlined complaint before addressing the question of whether there were cognizable claims against Ellison.

However, this is not the first DBSI case the Court has addressed. Prior to hearing the motion in this case, the Court had the opportunity to prepare a Report and Recommendation for similar motions brought by various defendants in the *Zazzali v. Swenson* matter. Having established an analytical framework for analyzing the various fraud-based claims in that case, it is somewhat less burdensome to simply apply that same logic to the factual allegations made here. The Ninth Circuit has held that verbosity and length are not, by themselves, sufficient bases for dismissing a complaint based upon Rule 8(a). *See, Hearns v. San Bernardino Police Dept.,* 530 F.3d 1124-1132 (9th Cir. 2008). In this case, the Complaint, though admittedly of excessive length considering that only a single defendant is being sued, nonetheless meets minimal standards of intelligibility and organization identified in the *Hearns* case.[4]

Despite this, if the Court were convinced that requiring the Trustee to narrow the complaint would in any way make the parties' task of litigating this case more manageable, it would do so. But the presence of several conspiracy-based claims convinces the Court that ultimately, such an exercise would probably not help turn an unwieldy case into a tidier one. Where a conspiracy is alleged, all members of a conspiracy are jointly and severally liable for

---

[4]The other cases cited by the Defendant in support of his 8(a) argument are distinguishable. The complaint in *Griggs v. Peabody,* 2009 WL 3200686 (D. R.I. 2009), cited at oral argument, reads more like a memoir than a legal document. The other cases cited by Ellison are of little benefit because they do not contain quotes from the offending complaints, and thus provide no means of comparison. *See, e.g. Nevijel v. North Coast Life Ins. Co.,* 651 F.2d 671, 673 (9th Cir. 1981); *Halajian v. NDEX West, LLC.,* 2012 WL 1969131 (E.D. Cal. 2012).

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  10**

the acts of their co-conspirators, even if they are unaware of the overall scope of the conspiracy.   This rule has an unimpeachable pedigree in American jurisprudence.  *See, e.g., Beltz Travel Service, Inc., v. International Air Transport Ass'n.,* 620 F.2d 1360 (CA.Cal. 1980) (antitrust case); *Securities Investor Protection Corp. v. Vigman*, 908 F.2d 1461 (9th Cir. 1990) (securities fraud case); *Oki SemiConductor Co v. Wells Fargo Bank, Nat. Ass'n.,* 298 F.3d 768 (9th Cir. 2002); *Aetna Cas Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994); *Chubb & Son Inc. v. Kelleher,* 2010 WL 5978913 at *6 (E.D. N.Y. 2010) (civil RICO, collecting cases).  The numerous allegations that do not address Ellison specifically do serve a purpose, in that they place him on knowledge of the scope of the conspiracy with which he is alleged to have played a role.  Thus, though it is not without sympathy for the task Ellison and his attorneys face in responding to the Complaint, the Court concludes that requiring the Trustee to re-plead would probably not serve to make this case proceed in a smoother fashion.[5]

For all these reasons, the Court recommends that Complaint not be dismissed on the basis that it violates Rule 8(a).

**B.    Whether the Complaint States Valid Claims for RICO, Common Law Fraud, and Aiding and Abetting Fraud, and Fraudulent Concealment (Counts 1-6, 13, 14, & 22)**

------

[5]Of course, the fact that Ellison has now been indicted may make his task in responding to the Complaint easier, if he chooses to assert his Fifth Amendment rights. See, *USA v. Swenson, et. al.,* 1:13-cr-00091-BLW.  If, however, Ellison chooses to answer the allegations in this case, it would be appropriate for him focus on those paragraphs that address him specifically, as opposed to simply lumping him in with other individuals, as well as those paragraphs which discuss a topic about which he has particular knowledge.  Other paragraphs may be addressed by way of more general denials.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  11**

The Court will next take up the question of whether the Complaint states valid claims for RICO and common law fraud, and in particular, whether these claims are pled with the particularity required by Rule 9(b).   The Court will address the claims for securities fraud separately, because those claims are subject to an even more stringent pleading standard than that imposed by the Federal Rules of Civil Procedure.

### 1.        Whether the Claims are Pled in Accordance with Rule 9(b)

The Report and Recommendation in *Zazzali v. Swenson* contained an extensive discussion of the legal background of RICO claims and the specific elements a plaintiff must plead in order to survive a motion to dismiss.  The Court will not repeat that discussion here, but will instead incorporate it by reference and summarize those aspects of it that are most critical to the issues herein.  (*Zazzali v. Swenson R&R,* p. 12-14).

In order to state a claim for a substantive RICO violation under either 18 U.S.C. § 1962(b) or (c), a plaintiff must plead the following elements: 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity.  *See, e.g. Odom v. Microsoft Corp.,* 486 F.3d 541, 547 (9th Cir. 2007).  Though sections 1962(b) and (c) have some distinct elements, the touchstone of both is that each individual defendant must be shown to have personally participated in a pattern of racketeering activity. "Racketeering activity," which is often referred to as the "predicate acts" requirement, may consist of "any act indictable under one of several provisions of Title 18 of the United States Code, including wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1961(1)(B)."  *Savage v. MTF Relocation Inc.,* 2012 WL

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  12**

822954 (N.D. Cal. 2012).  A defendant need not personally have mailed the offending letter or made the offending telephone call in order to be liable for a substantive RICO violation. Rather, "the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen*." U.S. v. Lothian,* 976 F.2d 1257, 1262 (9th Cir. 1992) (*citing Pereira v. United States*, 374 U.S. 1, 9 (1954)).  Though RICO violations are fraud-based claims that must conform to the strictures of Rule 9(b), *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1065–66 (9th Cir. 2004), "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Pro. 9(b); *See also Odom v. Microsoft Corp*., 486 F.3d 541, 553–54 (9th Cir.2006).

Like many of the Defendants in *Zazzali v. Swenson*, Ellison is alleged to have played a role in approving or "signing off on" the PPMs prior to their issuance.  Though PPM work was apparently handled by DBSI's outside counsel during some of the relevant time frame, the Complaint specifically alleges that from about 2006 onwards, the vast majority of all PPM drafting was done in house at DBSI, and that legal work concerning PPMs therefore would have been under Ellison's supervision as general counsel.  (*Id.,* ¶¶ 49 & 186).  The Trustee also alleges that the DBSI legal department was required to "sign off" on every PPM, as evidenced by sign-off sheets and checklists prepared in connection with each offering.  (*Id.,* ¶¶ 50, 302).  Most critically, and most specifically, the Complaint also alleges that emails reveal that Ellison as well as other DBSI attorneys received drafts of the PPMs and had to sign off on them prior to their finalization. (*Id.,* ¶¶ 50-51, 302-303). These allegations place Ellison

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  13**

in a position roughly equivalent to that of John Mayeron in *Zazzali v. Swenson*.  Since scienter

for RICO claims need only be averred generally, Ellison's apparent absence from the weekly

"cash meetings" discussed in *Zazzali v. Swenson* is not fatal to the Trustee's claims.  Since

substantive RICO violations have been adequately pled, the claim for RICO conspiracy under

18  U.S.C. § 1962(d) survives as well.

 For these reasons, the Court recommends that the federal RICO claims (Counts 1, 2,

and 3) not be dismissed at this juncture.  Since Idaho's racketeering statute closely tracks the

federal statute, Counts 4, 5, and 6 should also not be dismissed.

 **2.  Whether the RICO Claims are Barred by the Securities Fraud Exception.**

 The Court will next address whether the Plaintiff's federal RICO claims are barred by

18 U.S.C. § 1964(c).  That statue provides that no RICO plaintiff "may rely upon any conduct

that would have been actionable as fraud in the purchase and sale of securities to establish a

violation of section 1962."  18 U.S.C. § 1964(c). This is true even if the acts that form the

basis of liability would independently qualify as mail fraud or wire fraud under the federal

criminal law.  *See, Bald Eagle Area Sch. Dist v. Keystone Fin., Inc.,* 189 F.3d 321, 327 (3rd

Cir. 1999) (holding that a plaintiff cannot avoid the securities fraud exception by pleading

mail fraud or wire fraud "if the conduct giving rise to those offenses [also] amounts to

securities fraud"); *Armstrong v. American Pallet Leasing, Inc.,* 678 F.Supp.2d 827, 855-56

(N.D. Iowa 2009) (same); *Ling v. Deutsche Bank,* 2005 WL 1244689 at *3 (same); *cf.,*

*Howard v. America Online,* 208 F.3d 741, 749 (9th Cir. 2000) (holding that the securities fraud

exception in section 1964(c) is conduct-based).  Thus, if the TIC investments are properly

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  14**

considered securities, any offering documents made in connection with them effectively do not "count" for purposes of establishing RICO liability.

The Trustee does not contest this legal proposition, but instead, argues that the characterization of the TIC investments is a factual question not amenable to resolution on a motion to dismiss. Contrary to the Defendant's assertions, it does not appear that the Complaint unequivocally characterizes the TIC investments as securities. Rather, it appears that the Trustee has attempted to differentiate types of investments involved so as to preserve both RICO and securities fraud claims. Specifically, the Trustee's RICO clauses of action reference a "common design and purpose of fraudulently marketing securities ***and real estate***." ¶ 554 (emphasis added). Similarly, paragraph 266 states that "[t]he terms of the TIC offerings were set forth in PPMs (for securities offerings) and due dilligence binders ("DDBs") (for purported real estate offerings)." This distinction between securities offerings and real estate is maintained throughout the Complaint. (Complaint, ¶¶ 538, 554, 585, and 609).

Just because the TIC investments involved real estate does not obviate the possibility that they were structured in such a way that they meet the definition of securities under federal law.[6] Indeed, the Trustee acknowledges having filed lawsuits in other jurisdictions in which

---

[6] None of the defendants in the *Zazzali v. Swenson* case argued that the RICO claims should be dismissed on the basis of the securities fraud exception. Being unaware of this issue, in footnote seven of the Report and Recommendation on the Motions to Dismiss in *Zazzali v. Swenson,* the Court stated that since certain Due Dilligence Binders (DDBs) were issued in connection with real estate transactions, they did not appear to involve the sale of securities as required by 15 U.S.C. § 78j. (*See,* Case No. 1:12-00224-EJL-MHW, Report and

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  15**

this very assertion is made.  Whatever the case, the structure and characterization of the TIC investments is not something the Court is prepared to address in the context of a motion to dismiss.  *Cf., San Francisco Residence Club, Inc. v. Amado,* 773 F.Supp.2d 822, 829 (N.D. Cal. 2011) (holding that whether a TIC investment could be characterized as a security was a fact-based inquiry).  The Trustee is correct that alternative pleading is possible, though obviously, it cannot be sustained forever.  In any case, Defendant may renew this issue in the context of a Rule 56 motion for summary judgment.[7]

The above analysis does not affect the Idaho racketeering claims, because Idaho's statute has a broader definition of predicate acts, which specifically includes securities fraud. *See,* I.C. § 18-7803(a)(13) & (16).

For all the foregoing reasons, the Court recommends that the federal RICO causes of action not be dismissed on the basis of the securities fraud exception at this time.

### 3.    RICO Proximate Cause

Ellison also argues that RICO proximate cause is not pled with particularity.  The Court disagrees.  The Complaint establishes a very direct theory of causation: that the claimants were induced to invest in DBSI based upon false representations, and, as a result,

---

Recommendation on Motions to Dismiss, p. 24, n. 7, Dkt. 256).  In retrospect, the Court's observation on this point may have oversimplified what is in reality a complex issue.

[7]Of course, the RICO securities fraud exception is inapplicable to cases where the defendant has been criminally convicted.  18 U.S.C. § 1964(c).  However, Ellison's indictment does not appear to be an alternate basis for retaining the RICO claims, because civil RICO liability for criminal violations of the securities act does not arise unless and until the defendant is convicted.  *Id.*

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  16**

lost money. *Cf Hemi Group LLC v. City of New York, NY.,* 559 U.S. 1, 130 S.Ct. 983 (2010) (holding that RICO proximate cause should be evaluated in light of its common law foundations). The Complaint also alleges numerous misstatements that misled investors, and also alleges that each investor had to certify that in making the decision to invest, he or she relied upon the offering document at issue. (Complaint, ¶ 47). For pleading purposes, this is sufficient to establish proximate cause.

In Exhibit B to the Complaint, the Trustee has identified the various PAT assignors and also purports to identify the offerings in which they invested. (See, Trustee's Opposition Brief, p. 17 & Dkt. 1, Exh. B). Though it may be somewhat difficult for a person not familiar with the Trustee's designations to understand which particular offering each claimant invested in, it appears that there has at least been an attempt to provide this information. This is not a critical issue at this juncture, and it would serve little purpose to require an amendment on this subject. The parties should be able to resolve this issue either informally or through the discovery process.

### 4. Common Law Fraud, Aiding and Abetting Fraud, & Fraudulent Concealment (Counts 13, 14, & 22).

In Idaho, fraud consists of "(1) a statement or a representation of fact, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that there be reliance, (6) the hearer's ignorance of the falsity of the statement, (7) reliance by the hearer, (8) justifiable reliance, and (9) resultant injury." *Washington Federal Sav. v. Van Engelen*, ___P.3d ___, 2012 WL 5665109 (Idaho 2012.)   Other than the requirements that the

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  17**

defendant must knowingly make a false statement, there is no specific "scienter" requirement for fraud in Idaho. *See, e.g., Staff of Idaho Real Estate Comm'n. v. Nordling,* 135 Idaho 630, 635 (2001). As discussed above, Ellison is linked with numerous allegedly false statements in the PPMs by virtue of his having "signed off" on them. The state of mind for common law fraud may be averred generally. *See, McCoy v. Lyons,* 120 Idaho 765, 820 P.2d 360 (1991). Therefore, the Complaint states valid common law fraud claims.

Since alternative pleading is possible, the Court recommends that the claims for aiding and abetting fraud also not be dismissed at this juncture. The Court assumes for purposes of this motion that Idaho would recognize such a cause of action. *See, O'Banion v. Select Portfolio Services, Inc.,* 2010 WL 2824055 at *5 (D. Idaho 2010). Read in a light most favorable to the Plaintiff, the Complaint alleges that Ellison was aware of at least certain aspects of the alleged fraud, particularly the way the use of Accountable Reserve funds were being used, and that he provided substantial assistance to the other Insider Defendants in carrying out this scheme. *Id.* Consistent with the Court's earlier recommendation in *Zazzali v. Swenson,* the Court will recommend that Count 22 (fraudulent concealment) be dismissed as a stand-alone theory of recovery. Such a ruling, however, would not preclude Plaintiff from asserting a theory of fraudulent concealment as a rebuttal to affirmative defenses such as the statute of limitations.[8]

---

[8]The Court's dismissal of the fraudulent concealment claim in *Zazzali v. Swenson* was one subject of the Trustee's Limited Objections to the Report and Recommendation in that case. (*See,* Case No. 1:12-cv-00224-EJL-MHW, Dkt. 261, p. 1-4).

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  18**

## C.    Securities Fraud (Counts 20, 21, 23 & 24)

Though Trustee has brought securities-related claims arising both under federal and Idaho law, the parties focus their briefing on the question of whether the Complaint meets the pleading requirements of the PSLRA. Accordingly, the Court will focus its discussion on that issue as well.

A claim under Rule 10b-5 requires a demonstration of the following elements: 1) a misrepresentation or omission of material fact; 2) scienter 3) reliance; 4) causation and 5) damages, as well as a demonstration that the misrepresentations were made in connection with the sale of securities. *See, e.g., Livid Holdings, Inc. v. Solomon Smith Barney, Ltd.,* 416 F.3d 940, 946 (9th Cir. 2005) & 15 U.S.C. § 78j(b).  "[T]he enactment of the Private Securities Litigation Reform Act ("PSLRA") in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Exchange Act to require that a complaint plead with particularity both falsity and scienter." *In Re Daou Systems, Inc.,*  411 F.3d 1006, 1014 (9th Cir. 2005).  Here, the Trustee has pointed to numerous allegedly false statements in the PPMs and described them with particularity.  For pleading purposes, reliance, causation, and damages have also been established.  Thus, the primary question is whether the Complaint sufficiently alleges that Ellison personally participated in the alleged fraud and whether he did so with the requisite state of mind.  As was established in the RICO discussion above, Ellison's involvement in PPM work ties him to numerous alleged misrepresentations.  Therefore, Court will focus on the discussion from this point forward on

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  19**

the question of scienter.

In order to survive a motion to dismiss, a securities fraud complaint must state facts which give rise to an inference of scienter that is "cogent and at least as compelling as any other non-fraudulent inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 314 (2007). In order to prove the required state of mind in a securities fraud action, "the plaintiffs must show that defendants engaged in knowing or intentional conduct. . . . [R]eckless conduct can also meet this standard to the extent that it reflects some degree of intentional or conscious misconduct." *South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 782 (9th Cir. 2008). *Tellabs* further instructs that the allegations in a securities fraud complaint are to be read "holistically," rather than in a segmented fashion that separately analyzes different types of scienter allegations. *See, Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991-92 (9th Cir. 2009).

For somewhat different reasons than those discussed in *Zazzali v. Swenson,* the Court concludes that the Complaint states valid claims for securities fraud. It does not appear that Ellison was as integrated into the overall structure and management of the various DBSI companies as some of the defendants in the companion case. This is apparent from a glance at Exhibit "A," which lists Ellison only twice, as a member of the Board of Directors of DBSI, Inc. and of DBSI Reality, Inc. This is in contrast to the defendants in *Zazzali v. Swenson*, many of whom were officers and/or directors of numerous DBSI entities. (Complaint, Exh. A). For these reasons, the "core operations" inference, which the Court concluded was

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  20**

permissible as to several of the defendants in the *Swenson* case, falls short in this context. *Cf. City of Marysville v. NightHawk Radiology, Holdings, Inc.,* 2011 WL 4584778 at \*21 (D. Idaho 2011) (holding that the core operations inference, standing alone, **usually** falls short of PSLRA standards) (emphasis added).

In its briefing, the Trustee points to a number of facts that allegedly support an inference of scienter to support all fraud-based causes of action, including securities fraud. Specifically, the Trustee cites 1) Ellison's longstanding relationship with Douglas Swenson 2) the fact that he was a founding member of DBSI; 3) his status as general counsel during the relevant time frames; 4) his attendance at board meetings and accounting and finance presentations where DBSI's financial difficulties were discussed; 5) his role in drafting and/or approving PPMs and DDBs for certain TIC and funding entity offerings; 6) the fact that he spearheaded the FOR 1031 concept, instituted the Loan Committee, and prepared term sheets for note offerings; and 7) his awareness that DBSI's financial statements did not conform to GAAP. (Trustee's Brief at p. 13, Dkt. 19, Complaint ¶ 502). Finally, the Complaint also alleges that Ellison was aware that the Accountable Reserves were not segregated. (*Id.,* ¶ 378)

Many of these facts are, at best, equivocal. As discussed above, certain facts–for example, Ellison's longstanding relationship with Douglas Swenson, the bare fact that he instituted the Loan Committee, and the unexplained reference to "footnotes" to financial statements that he supposedly drafted, do not, without any contextual support, seem to have much bearing on Ellison's state of mind.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  21**

Other allegations, however, are more to the point.  One of the Trustee's primary theories of liability has to do with the "Accountable Reserve" language found in most, if not all, of the PPMs.  According to the Trustee, the Accountable Reserves were funds routinely designated by DBSI to be set aside to pay costs and expenses in connection with TIC investment properties over the terms of the master lease.  Per the terms of various PPMs, these funds had certain, quite limited, authorized uses. (*Id.,* p. 2).  The Trustee asserts that the Accountable Reserve language in various PPMs misled investors into believing that these monies would be segregated, when in fact, they were commingled with company funds, used to pay existing debts, and used to fund payments to Insiders.  (*Id.*, ¶ 310, 316, 322, 329, 334, 341, 346, & 349).  Critically, the Trustee alleges that in an interview with the Bankruptcy Examiner in August of 2009,  Ellison admitted that the Accountable Reserve funds were not segregated into separate accounts.  (*Id.*, ¶ 378).   It also alleges that Ellison drafted or reviewed the Accountable Reserves language found in many, if not all, of the PPMs.  Although this allegation is made on information and belief, there is a vague factual hint that this task would have fallen to Ellison as DBSI's general counsel.  (*Id., ¶* 307).

Though the issue is a close one, the Court concludes that these allegations create a strong inference of scienter at least as to those aspects of the claims arising from the commingling of the Accountable Reserve Funds.  Publication of false information may itself be indicative of scienter "where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  22**

disputed information," or when such allegations "are buttressed with detailed and specific allegations about management's exposure to factual information within the company." *Zucco Partners, LLC v. Digimarc Corp,* 552 F.3d 981, 1000 (9th Cir. 2009).

By his own admission, Ellison was aware that the Accountable Reserve monies were not being segregated.  Given the extensive involvement of Ellison and the legal department in PPM work, it is fair to infer that Ellison was generally aware of the contents of those PPMs, including the Accountable Reserve language that was allegedly misleading to investors. The Complaint alleges that from 2006 onwards, **all** PPM work was done in-house at DBSI.  It also alleges that  Ellison was involved in aspects of PPM work prior to that time.   In addition, the TIC investments were one of DBSI's principal products. As DBSI's general counsel, Ellison would likely have been aware of how those investments were structured and marketed, just as the general counsel of an insurance company would be likely to know how the company's primary policies work. *Cf, Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982, 988 (9th Cir. 2008) (CEO and CFO of a corporation were likely to know of substantial "stop work" orders that eliminated tens of millions of dollars of revenue that was nonetheless included in company's earnings forecast); *Makor Issues & Rights, Ltd. v. Tellabs., Inc.,* 513 F.3d 702 (7th Cir. 2009)  (corporate senior management likely to know about "teething troubles" that would delay the rollout of the company's flagship product).[9]

_____

[9]The Complaint also goes so far as to allege, "on information and belief," that Ellison actually drafted, or oversaw the drafting of, the Accountable Reserve language.  However, such allegations cannot be used to meet the pleading standards of Rule 9(b) or the PSLRA, and the

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  23**

Certain other allegations of the complaint serve to buttress the inference of scienter. In particular, the Complaint alleges that Ellison was informed by Paris Cole and Matthew Duckett that DBSI's financial statements did not conform to generally accepted accounting principles ("GAAP") and that DBSI was not keeping up with changes in accounting standards. (Complaint, ¶ 502).  Violations of GAAP may be a factor in the scienter calculus where they are significant and obvious.  *See, e.g. In re Daou Systems, Inc.,* 411 F.3d 1006 (9th Cir. 2005) ("violations of GAAP can also provide evidence of scienter when significant violations are described with particularity); *see, also, In re MicroStragety Inc., Securities Litigation, 115 F.Supp.2d 620* (E.D.Va. 2000) (collecting cases and holding that "when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").  Here, the Trustee has alleged a number of specific violations of accounting standards  that enabled DBSI to conceal its insolvency.  These violations are described in paragraphs 503 to 517 of the Complaint.  For example, the Complaint alleges that DBSI failed to record several hundred million dollars' worth of liabilities it had guaranteed.  These could not accurately be described as contingent liabilities, because DBSI was continually disbursing funds to support TIC entities that could not generate sufficient income to meet their rent and loan obligations.  (*Id.* ¶ 504). According to the

---

Court therefore does not consider it. Nonetheless, the Court believes an inference of scienter is possible even without this allegation.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  24**

Complaint, guarantee liability on the TIC portfolio alone was in excess of several hundred million dollars.  (*Id.,* ¶  505). It also alleges that DBSI was able to mask its insolvency by overstating assets in the form of receivables from affiliates, by failing to account for the near total insolvency of some of these affiliates.  In particular, as recently as June 30, 2008, DBSI listed Stellar and the Technology Companies as having a value of $235,000,000. (*Id.,* ¶¶ 506-507).  The Trustee alleges that un-collectable debts from affiliates were also used to offset "hard" debts with a defined maturity date, thus creating an impression of solvency. (*Id.,* ¶ 508). These allegations describe significant departures from accepted accounting standards that overstated DBSI's net worth by very large amounts, sometimes hundreds of millions of dollars. Thus, the Complaint identifies significant violations of accounting standards and describes them with particularity sufficient to meet the standards articulated by the Ninth Circuit *In re Daou Systems, Inc*.

For all these reasons, the Court recommends that the securities fraud claims not be dismissed. Consistent with its decision in *Zazzali v. Swenson,* the Court will also recommend that the control person liability claims not be dismissed, on the basis that alternative pleading is possible, though again, the concept of control person liability seems conceptually ill-suited where primary violations are alleged**.** *Zazzali v. Swenson R&R,* (Dkt., 256, p. 27). Because Defendants have offered no argument as to the Idaho securities fraud claims, other than to state generally that they are not pled with particularity, the Court recommends that these claims also not be dismissed.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  25**

**D.      Professional Negligence Claims–Counts 7 and 12**

The Trustee has brought two negligence claims.  The first (Count 7) is styled as a legal malpractice claim, and is brought on behalf of the Estate Litigation Trust.  The second claim (Count Twelve) is styled as a simple negligence claim, but references "professional duties of care."  Count Twelve is brought on behalf of both the Estate Litigation Trust and the Private Action Trust.

The Court recommends that Count Twelve be dismissed, without leave to amend. Under Idaho law, the Trustee does not have a viable negligence claim against Ellison on behalf of the investors or creditors who have assigned their claims to the PAT.  *See, Harrigfeld v. Hancock,* 140 Idaho 134, 139, 90 P.3d 884, 889 (2004) (holding that a direct attorney-client relationship must exist between a plaintiff and an attorney-defendant except in the very narrow circumstance of beneficiaries under a will).  While it is true that Count Twelve is not overtly styled as a legal malpractice claim, the only duties mentioned in this count are "professional duties of care."  This appears to be a malpractice claim in disguise, and thus, as to the ELT,  it overlaps with Count Seven.  It should therefore be dismissed in its entirety.

Ellison's argument regarding Count Seven is twofold.  He first argues that Idaho courts have never recognized claims by a corporation against an in-house attorney.  In support of this proposition, he relies on an unpublished decision from California,  *1538 Cahuenga Partners, LLC v. Fabe,*  2012 WL 19519 (Cal. App. 2012).

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  26**

In Idaho, the elements of a legal malpractice claim are: 1) the existence of an attorney-client relationship; 2) the existence of a duty on the part of the lawyer; and 3) failure to perform the duty, and 4) proximate cause. *Bishop v. Owens,* 152 Idaho 616, 620, 272 P.2d 1247, 1251 (Idaho 2012). Case law on this issue is sparse, but a number of professional publications suggest that claims against in-house counsel, though rare overall, are fairly common where a third party such as a trustee or receiver takes over management of a company. *See, e.g., Blowing Whistles & Climbing Ladders,* 23 No. 4 ACDKT 32 at * 43 (April 2005); *Business Counselor's Law and Compliance Practice Manual* § 4:4 (March 2013). The *Cahuenga Partners* case notwithstanding, the present claim fits within the framework for legal malpractice established by Idaho courts, and the Court can discern no reason why in-house attorneys would be an exception to the general rule.

Ellison also argues that the Complaint does not adequately state a claim for legal malpractice arising from his duties as DBSI's outside attorney. (Response Brief, p. 18). This assertion has some merit. While Count Seven contains an adequate enough description of the allegedly negligent conduct, it also asserts that Ellison, "*both as DBSI's outside counsel and in-house counsel, including as general counsel, owed duties of care to DBSI."* (Complaint, ¶ 635) (emphasis added). However, Ellison did not return to DBSI as in-house counsel until 2004, which is also when the Trustee has alleged that DBSI began to take on characteristics of a Ponzi scheme. Likewise, the PPMs referenced in the Complaint were all for offerings dating from 2005 or later. (*Id*, ¶¶ 195 - 235). It is not at all clear what events

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  27**

dating from before Ellison's return to DBSI in 2004 have to do with the present lawsuit. However, the Court will allow the Trustee to re-plead this cause of action to clarify what, if anything, Ellison's actions prior to his return to DBSI in 2004 have to do with its claims.

To summarize, the Court recommends that Count Twelve be dismissed in its entirety, and Count Seven be dismissed with leave to amend to clarify what, if any, role Ellison's pre-2004 conduct plays in the present context.

### E.   Breach of Fiduciary Duties and Aiding and Abetting Breach of Fiduciary Duties (Counts 8, 9, 17 & 18).

Consistent with its ruling in *Zazzali v. Swenson,* the Court will recommend that claims for breach of fiduciary duties be treated as fraud-based claims that must be pled with particularity. (Report & Recommendation, p. 28-29).

Count Eight is a breach of fiduciary duty claim filed on behalf of the ELT.  The Court recommends that it be dismissed, subject to leave to amend. Not only does it fail to differentiate between Ellison and the other members of the "Control Group," it also fails to identify the specific fiduciary relationship at issue and the conduct that allegedly violated that relationship. As the Court observed in *Zazzali v. Swenson,* breach of fiduciary duty claims arise from specific types of relationships, which must be identified before any claim can lie. "Before a fiduciary duty can be breached, there must exist a fiduciary relationship. A fiduciary relation exists between two parties when one is under a duty to act or to give advice for the benefit of the other upon a matter within the scope of the relation." *Podolan v. Idaho Legal Aid Services, Inc.,* 123 Idaho 937, 947 (Ct. App. 1993).  Simply because Ellison may have

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  28**

been a fiduciary of one or two of the DBSI entities does not mean that he was in a fiduciary relationship to all the Debtor Entities at all relevant times.  Thus, the Court recommends that Count 8 be dismissed, subject to leave to amend.  Any amendment must focus more specifically on Ellison and identify,  at a minimum:  1) the specific relationship or facts alleged to give rise to fiduciary duties 2) the relevant Debtor entity or entities 3) the conduct that allegedly breached that relationship and 4) the dates of the conduct and the dates of the relationship.

Count 9 is a claim for Aiding and Abetting Breach of Fiduciary Duty on behalf of the Estate Litigation Trust and Count 18 is a similar claim on behalf of the Private Action Trust. In order to be liable for aiding and abetting a civil wrong, a plaintiff must allege 1) the existence of an underlying wrong 2) that there was knowledge of the wrong on the part of the aider and abettor; 3) substantial assistance by the aider and abettor, and 4) damages proximately caused thereby.  *O'Banion v. Select Portfolio Services, Inc.,*  2010 WL 3834055 * 4 (D. Idaho 2010);  *Cf, State Dept of Finance v. Tenney,*  124 Idaho 243, 250, 858 P.2d 782, 789 (Ct. App. 1993) (citing substantially similar elements for aiding and abetting securities fraud under Idaho law).  The Court recommends dismissal of these Counts with leave to amend, for reasons similar to those stated for Count 8.   Any amendment must specify the above described elements with the specificity required by Rule 9(b).

Count Seventeen is a Breach of fiduciary duty claim brought on behalf of the Private Action Trust.  (Complaint, p. 129).  The Court will recommend that this claim be retained, at

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  29**

least for the time being.  The claim arises from the alleged commingling of the Accountable

Reserve funds.  Essentially, the Trustee asserts that a fiduciary or fiduciary-like relationship

was created when the Defendant promised Investors that the Accountable Reserve funds

would only be used for certain purposes, and that this trust relationship was breached when

the funds were commingled with DBSI's general business accounts.  Thus, unlike the other

more generalized breach of fiduciary duty claims, the specific facts giving rise to a fiduciary

relationship and the conduct alleged to have breached it are adequately delineated for pleading

purposes.[10]

### F.    Punitive Damages

"The question of whether to permit a claim for punitive damages is substantive in

nature and accordingly is controlled by relevant Idaho [law]" for all claims and causes of

action arising under state law. *Bauer v. Metropolitan Life Ins. Co.,* 2010 WL 2595291 at *5

(D. Idaho 2010); *See also, Wisdom v. Centerville Fire Dist., Inc.,* 2010 F.Supp. WL 468094

at *11 (D. Idaho 2010) ("a federal court exercising supplemental jurisdiction over state law

claims is bound to apply the law of the forum state to the same extent as if it were exercising

its diversity jurisdiction.").  Accordingly, the claim for punitive damages should be dismissed,

subject to leave to amend according to the procedures set forth in I.C. § 6-1604. However, the

Trustee is also correct that this logic would not apply to the treble damages provision of

---

[10] Though the basis for relief delineated in Count Seventeen is reasonably clear, the Court takes no position on whether the promises made with respect to the Accountable Reserve monies actually gave rise to a fiduciary duty under Idaho law.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  30**

RICO, or to any other aspect of damages arising under a federal statute.

G.      **Civil Conspiracy & Negligent Misrepresentation (Counts 10 and 15)**

In *Zazzali v. Swenson*, the Court held that Idaho does not recognize a cause of action for negligent misrepresentation outside the narrow confines of an accountant-client relationship.  The Court will adhere to that recommendation in this Report.  The Trustee has accepted without argument, and has indeed argued in favor of, application of Idaho law to the state racketeering and securities fraud claims, the common law fraud claim, the malpractice claims, and the fiduciary duty claims.  The Trustee offers no explanation as to why Idaho law would apply to some claims and not others.   Thus, it appears to the Court that there is not a genuine choice of law issue here, but rather, a formalistic attempt to preserve a cause of action that is simply not recognized in this state.

Next, while civil conspiracy is not an independent tort, it can give rise to legal remedies "if there is an agreement between two or more [individuals] to accomplish an unlawful objective in an unlawful manner."  *See, e.g. Mannos v. Moss,* 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007); *Gibson v. Credit Suisse,* 787 F.Supp.2d 1123, 1139 (D. Idaho 2011).  The Court recommends that this claim be retained, for the same reasons as stated in the *Zazzali v. Swenson*  Report and Recommendation.

H.      **Misappropriation/Unjust Enrichment and Breach of Trust (Counts 11, 16, & 25)**

As in Zazzali v. Swenson, the Court will recommend granting the motion to dismiss Counts 11 and 16 to the extent that they contain misappropriation claims.  These claims arise

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  31**

from the alleged commingling of Accountable Reserve funds with general operating accounts. However, the very fact of the co-mingling forecloses an equitable claim for misappropriation under Idaho law.   *See, Taylor v. McNichols,* 243 P.3d 620 (2010) (money in a misappropriation claim must be described as a specific chattel); *Warm Springs Properties Inc. v. Andora Villa, Inc.,* 96 Idaho 270, 272, 526 P.2d 1106, 1108  (1974) (holding that a misappropriation claim did not lie once funds at issue lost their specific identity through mixture into defendant's general checking account.).   Finally, Defendant offers no specific argument why unjust enrichment claims (Count 11) and breach of trust claims (Count 25) would not viable, other than the generalized argument that they have not been pled with the particularity required by Rule 9(b).  The Court, however, believes that these claims meet these standards, and therefore recommends that they not be dismissed at this time.

## RECOMMENDATION

1.    The Undersigned recommends that the Motion to Dismiss (Dkt. 13) be **DENIED,** with the exception of Counts 12 (general negligence), Count 15 (negligent misrepresentation), and those portions of Counts 11 and 16 which deal with misappropriation.  These claims should be dismissed **without** leave to amend.

2.    The Court further recommends that Counts 7, 8, 9, and 18 (legal malpractice, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty), be dismissed **with** leave to amend as stated in this Report.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  32**

3.   The Court further recommends that claims for punitive damages arising from state law causes of action be dismissed, with leave to amend as stated herein and in accordance with the requirements of I.C. § 6-1604.

4.   Written objections to this Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.



DATED: May 9th, 2013

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS  33**